[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, Tri Source, Inc., is a Connecticut corporation situated in Shelton, Connecticut, in the business of developing and manufacturing custom power sources. In January of 1996, the plaintiff met with representatives of the defendant, E-Lite Technologies, Inc., at the behest of Conn-Step, a state agency acting as a facilitator, to determine if the plaintiff could design and build an inverter to power a large lamp patented by the defendant. The type of design of the light in question is an electro-luminescent panel that can be affixed to or incorporated into any number of items for display and advertising purposes. From the beginning, the defendant indicated that the first order of 1500, if successfully developed, would go to a Danbury company in the business of building trash containers. Those containers were described as about three and a half feet high by two feet wide on all four sides. The containers were to be free standing and be utilized outside. The luminescent panels would cover all four sides of the containers.
After numerous discussions between the parties, they eventually came to terms on a contract dated May 28, 1996 (plaintiff's exhibit B) wherein the plaintiff would design the inverter, build a breadboard design for $17,950, participate in U.L. testing for $5,000 or less, build prototypes at $240 per unit and eventually build 1500 units at $89.00 each which the defendant would accept within one year.
It appears to the court that much of the work was experimental, required a new and unique design and probably could have been terminated at any point if the design was not accepted and approved. Although the original intended customer was the trash container manufacturer, both parties realized that if there was a successful design the lamps and inverters could be used on countless other products. The contract specifically provided that the inverter will be designed to serve a family of lamps from 1600 in2 to 2200 in2 but the plaintiff opined that the inverter "will work well all the way down to 1000-1200 in2. CT Page 13458-b
The defendant supplied he specifications for the lamp and the plaintiff designed and produced the breadboard design of the inverter. The defendant through its agents came to see it and they approved of and seemed quite happy with it. Thereafter, the plaintiff built the prototypes to let the defendant test them in their own facility and get U.L. approval. The evidence, though somewhat conflicting, would indicate that the inverters did power the lamps and the defendant sent a prototype to Underwriters Laboratory for approval which was subsequently granted. It would appear that the first three items on the order were paid for.
Eventually 384 units were delivered and invoiced to the defendant between March 31, 1997, and May 28, 1997, of which 163 were paid for leaving a balance of 221 units unpaid and leaving a balance due of $19,862.03. A humming noise was discovered early on and the parties agreed to a noise level that was acceptable. Plaintiff's exhibit D, its invoice of March 31, 1997, reflects the defendant's notation of "O.K. if quiet." The plaintiff met that noise level for the first 384 units at a slight additional charge. In the plaintiff's opinion that limited noise level was acceptable for the intended use on the garbage containers. When the defendant showed the inverter to other customers for other uses, apparently the noise level was too high and the plaintiff at its expense engineered a new transformer with a Toroidal design which in fact solved the noise problem. Apparently, there remained other problems with short circuit protection and voltage limitation.
The parties are at issue as to whether the inverter worked on all applications, but it is clear that as problems arose, the plaintiff solved them or tried to. See plaintiff's exhibits F and G. The defendant did not cancel the order or in any way indicate that they did not intend to pursue the project as of March of 1998. By fax dated July 9, 1997 (defendant's exhibit 10), the defendant agreed to accept the balance of the units at somewhat higher prices.
It was not until October, 1998 that the defendant notified the plaintiff that the trash container project had been cancelled and it was cancelling its order for the balance of the 1500 electronic ballasts. No evidence was ever presented by the defendant as to the name of the Danbury concern which originally ordered the panels for its trash containers or why the order was canncelled. In fact, there was no evidence presented that a single inverter was provided to it, that it ever tested them or found them satisfactory or unacceptable. The only evidence the defendant presented was that some of the inverters were shown at trade shows, some were sent to other unknown customers somewhere CT Page 13458-c in or out of this country and they found them unsatisfactory for their application. The court has no idea if those applications were in any way similar to the trash container project or if the lamps were of a similar size or design.
On October 6, 1998, in light of the cancellation, the plaintiff wrote the defendant asking for $19,862.03 representing the outstanding invoice for the 221 units that had not been paid for. The plaintiff also indicated it would seek to be reimbursed for cancellation charges for materials ordered and asked the defendant if it had any use for materials ordered for the trash container project. It received no response. It also appears that the defendant never returned any of the 384 inverters that had been delivered to it.
The defendant in its brief claims that it finally cancelled its order of May 28, 1996, for the 1500 units in the fall of 1998, not because the trash container project had been cancelled but because those units were not usable and those sent to other customers were being returned with blown fuses and other problems. What the defendant has never presented is any proof that the units were unusable by the trash container manufacturer they were designed for.
The defendant further claims that, within a few months after the cancellation, with the assistance of Joseph Fleming, an electrical engineer now employed by the defendant, who redesigned the unit, it now provided all the functions desired by the defendant.
The court heard the testimony of the principals involved in this project from each company and their experts and engineers. There was predictably little agreement or common ground between them. The court concludes that the design was a work in progress. The plaintiff's chief design engineer on the project, Ahmad Esmi, testified that his design did exactly what it was supposed to do and that noise level and short circuit protection were simply not an initial requirement of the design, but were in fact solved at a later stage. He testified he designed the inverter for a specific lamp and a specific use, the garbage receptacles, but the defendant kept changing the characteristics of the lamp which required constant redesigning. Despite the problems, both parties appeared to be honestly interested in making the design work because of its potential for additional uses.
Both parties agree that this case is controlled by the provisions of the Uniform Commercial Code, in particular Article 2 which applies to all contracts for the sale of goods, whether those goods be existing at the CT Page 13458-d time of sale or whether, as in this case, they are to be specially manufactured. See, e.g., § 42a-2-106 (a); § 42a-2-204 (3)(a); § 42a-2-704 (2). In analyzing this case the court concludes that it should separate the 384 units that were in fact delivered and the balance of the 1500 ordered units that were never delivered. Those first 384 units were delivered by May 28, 1997, and 163 were actually paid for. The balance are still in the possession of the defendant. The order was not cancelled until the communication of October, 1998.
Under Section 42-2-602 (1), rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller. The court finds that the original 384 units supplied by the plaintiff met their specifications, were not seasonably rejected by the defendant, and therefore the plaintiff is entitled to recover the $20,108.79 that was due for the 221 units that were received and not paid for.
The balance of 1,116 units presents a different problem. Obviously, they were never built and thus never delivered. Unquestionably there were problems with their design and usability or they would have been built and delivered. It was in the interests of both parties to accomplish a successful design. It was apparently never done. The contract called for the delivery of the 1,500 units to be within one year of the start of production. That was never done. The defendant cancelled the balance of the order in October, 1998 and the court finds that was a timely and sufficient rejection of the balance of the delivery.
On the overall question of damages, the court concludes that the plaintiff is entitled to also recover the cancellation charges of $5,788.70 that it incurred.
As to the additional engineering costs of $83,027.88 the plaintiff claims it incurred in solving new problems with the design, there is no basis for recovery. There is nothing in the contract (plaintiff's exhibit A) or any subsequent writing or oral agreement that would obligate the defendant to pay for those costs. Both sides here have lost money in trying to develop a successful product. If it had been successful, the extra engineering costs could have been recovered through new orders. The plaintiff's president essentially admitted that. If the plaintiff wanted to be paid for the additional engineering costs, it had to contract with the defendant to pay for them. It did not and it may not recover them now.
Additionally, the plaintiff's president testified that if the entire CT Page 13458-e order of 1,500 inverters had been built and delivered there would have been no profit because of the additional engineering costs.
The last item of claimed damages was the sum of $23,285.85 for materials apparently purchased by the plaintiff to complete the production run of 1,500 inverters. In its brief the plaintiff refers to exhibit I for proof of this item of damages. Exhibit I is a letter dated October 6, 1998, after the cancellation of the balance of the order, from the plaintiff's president to the defendant's president. It acknowledges the cancellation of the order, asks for certain payments already incurred, and refers to cancellation charges it will incur and forward later. There is no mention of materials ordered in the amount of $23,285.85 or in fact any number. There was some evidence produced in the testimony of the plaintiff's president that there were materials ordered in that amount, but no invoice or other documentary evidence was produced to support that figure. Further, no explanation was offered as to where that material is today, whether it was scrapped, resold or returned. There may be some loss that actually was incurred here, but the court concludes that the plaintiff has failed in its obligation to prove by the proper standard of proof what that actual number was.
The court, therefore, orders judgment for the plaintiff on the complaint in the amount of $20,108.79 for the 221 units delivered and not paid for with interest at the rate of ten percent (10%) from May 28, 1997, the date of the final invoice and the additional amount of $5,788.70 for cancellation charges with interest at the rate of ten percent (10%) from October 6, 1998.
GORMLEY, J.